### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

AMBASE CORPORATION and SDG    :
FINANCIAL CORPORATION,        :
                              :
    Plaintiffs,              :
                              :
v.                            :    No. 3:00CV1694(DJS)
                              :
SDG INC., W. BLAIR GEHO,       :
ROBERT GEHO, HANS GEHO,        :
CHARLES FULGRAF, CHARLES       :
BRAIN, NEIL FLANZRAICH, and    :
MALCOM JOZOFF,                 :
                              :
    Defendants.              :

### <u>MEMORANDUM OF DECISION</u>

Plaintiffs, AmBase Corporation ("AmBase") and SDG Financial Corporation ("Financial"), bring this action against defendants SDG, Inc. ("SDG"), W. Blair Geho (hereinafter "Blair Geho"), Robert Geho, Hans Geho, Charles Fulgraf, Charles Brain, Neil Flanzraich, and Malcolm Jozoff alleging breach of contract against defendant SDG (First Claim), breach of the covenant of good faith and fair dealing against defendant SDG (Second Claim for Relief), breach of contract against defendant Blair Geho (Third Claim for Relief), breach of the covenant of good faith and fair dealing against defendant Blair Geho (Fourth Claim for Relief), fraud against all defendants, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a-42-110q, against all defendants. Counterclaim plaintiff SDG brings an action for damages against counterclaim

defendant Financial alleging breach of fiduciary duty (Count I), breach of written contract (Count II), breach of unwritten contract (Count III), negligence (Count IV), and promissory estoppel (Count V).  From April 28, 2003 through May 2, 2003 and again on May 28, 2003 and May 29, 2003, this case was tried to the court.

## I. SUMMARY

The parties come before this court as participants in a failed business relationship.  On December 30, 1997, SDG, which is a start-up biotechnical company, retained AmBase's subsidiary Financial to be SDG's exclusive investment banker by way of an Investment Banking Agreement executed contemporaneously with Financial's purchase of 6.37% of SDG's stock at the price of $1.25 million under the terms of a Stock Purchase Agreement.  SDG terminated Financial's services on April 11, 2000 for the stated reason that Financial had materially failed to perform its obligations under the Investment Banking Agreement.  Financial and AmBase[1] then sued SDG and certain individual directors for damages resulting from, among other things, breach of the Investment Banking Agreement and fraud.  SDG counter-sued for damages resulting from Financial's breach of fiduciary duty,

---

[1] AmBase itself was not a party to the contracts at issue in this case.  AmBase's standing to bring claims has not been challenged before this court, and the court therefore does not render any decision on the propriety of AmBase's status as a party to this case.

breach of the Investment Banking Agreement, negligence, and promissory estoppel.

Financial claims that SDG made false assurances to Financial in an effort to secure Financial's $1.25 million investment. Financial claims that SDG knew Financial would not invest money unless SDG retained it as SDG's exclusive investment banker.  The value of the Investment Banking Agreement to Financial was that it had the exclusive opportunity to earn commissions from the sale of SDG stock, which Financial believed it could successfully sell at a $15 to $20 million valuation of SDG.  Financial's claim is that SDG did not disclose to Financial that SDG would not accept investment at a $15 to $20 million valuation of SDG, but instead wanted investments at a $40 million valuation of SDG. When Financial realized that SDG would not in fact accept investments procured by Financial at a $15 to $20 million valuation of SDG, it believed that SDG had denied it the opportunity to realize the value of its investment.

What ensued was a stalemate: Financial did not believe in marketing SDG at a $40 million valuation, and SDG's management did not understand why Financial had not raised capital. Financial's efforts to raise capital never began in earnest because the parties could never agree about SDG's value.  As a result, Financial claims that it lost the opportunity to earn a fee based upon investments in SDG.  SDG's management, however,

either had to abandon its belief that SDG was worth $40 million so that it could raise capital through Financial or find another investment banker who shared its views and would perform the services for which it had been retained.  SDG claims that Financial kept its business in the doldrums for a period of about two years, from which SDG has yet to emerge.

## II. PRELIMINARY MOTIONS

The parties have submitted four motions to the court. First, in their motion to strike (dkt. # 87), plaintiffs seek to strike hearsay statements set forth in paragraphs 38, 52, and 56 of defendant Robert Geho's affidavit, paragraphs 50, 52, 53, and 67 of defendant Blair Geho's affidavit, and paragraph 28 of defendant Hans Geho's affidavit.  In addition, plaintiffs seek to strike various portions of the deposition transcript of defendants' witness Jonathan Silverstein.  In support of this objection, plaintiffs argue that defendants have failed to designate which specific parts of Silverstein's transcript they wish to offer at trial, and instead have included his entire ninety-page transcript.  Plaintiffs do not object to any particular portion of the deposition transcript, but rather to the form in which it was presented to the Court.  Plaintiffs' motion to strike (dkt. # 87) is **DENIED** for the reasons set forth in defendants' memorandum of law in opposition thereto (dkt. # 115).

Defendants' Motion to Strike Testimony of Linda Allison (dkt. # 78) is **DENIED** for the reasons set forth in plaintiffs' Memorandum in Opposition to Defendants' Motion to Strike (dkt. # 124).

Plaintiffs object to the admission of the Rule 30(b)(6) deposition transcript of plaintiff Financial, which is given by Richard Bianco.  Alternatively, plaintiffs ask that, if the court admits the deposition transcript, the court strike several portions of Financial's deposition transcript relating to documents not introduced into evidence during the trial.  After reviewing the arguments submitted by both parties on this issue, the plaintiffs' objection to the admission of the transcript as a whole is overruled for the reasons cited by defendants.  The court agrees with plaintiffs, however, that the particular portions set forth on page five of plaintiffs' memorandum of law (dkt. # 106) are inadmissible; plaintiffs' objection to the admission of these portions is therefore sustained.  Accordingly, plaintiffs' Objection to the Admission of Plaintiffs' 30(b)(6) Deposition Transcript (dkt. # 106) is **SUSTAINED in part** and **OVERRULED in part**.

Finally, Flanzraich has filed a motion for judgment on partial findings (dkt. # 102) pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, which allows the court to enter judgment as a matter of law in the moving party's favor at any

point in the proceedings when the court finds that the non-moving party has been fully heard and cannot maintain a claim under controlling law.  Here, the court elected to hear all the evidence before deciding Flanzraich's motion.  Because the court finds that plaintiffs have presented sufficient evidence to frame issues of fact for the court's ultimate decision, Flanzraich's motion (dkt. # 102) is **DENIED.**

### III. FINDINGS OF FACT

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court has considered the admissible evidence offered at trial and finds the following facts.

1.    Richard A. Bianco ("Bianco") is, and has been at all relevant times, the Chairman, President, and Chief Executive Officer of AmBase Corporation ("AmBase") and SDG Financial Corporation ("Financial"), and since 1998, has been a Director of SDG.

2.    Before joining AmBase in 1991, Bianco was an investment banker and Managing Director at Dillon, Read & Co. Inc., Morgan Stanley & Co., Inc. and Bankers Trust Company for approximately 20 years.  Bianco is experienced in investment banking and capital markets finance including work with some companies in the biotech and pharmaceutical industries.  Bianco's background is primarily in investment banking and finance; he is not trained in biological science.

3.    AmBase is a Delaware corporation with its principal places of business in Greenwich, Connecticut.  AmBase is a publicly traded company listed on the NASDAQ stock exchange.

4.    Financial is a wholly-owned subsidiary of AmBase. Financial was formed in December 1997 for the primary purpose of performing investment banking activities for SDG and its subsidiaries as part of an investment deal entered into between it and SDG in December of 1997.  Financial is a Delaware corporation with its principal place of business in Greenwich, Connecticut.

5.    SDG, Inc. ("SDG") is an Ohio Subchapter S corporation based in the Cleveland, Ohio area.  SDG is owned by approximately forty shareholders.  SDG is a privately-held biopharmaceutical research and development corporation, which was formed in July of 1993.  SDG's primary business purpose is to invent, patent and develop targeted drug delivery systems for pharmaceutical and consumer product applications.

6.    In and around December of 1997, the individual defendants and other directors owned 99.3% of SDG's stock: 72.39% of the company was held by Blair Geho, Robert Geho, and Hans Geho; Malcom Jozoff held 13.84%; and Neil Flanzraich owned 6.95%. Two other non-party directors owned 4.13% and 2.08% each.  Other members of the Geho family also owned small percentages of SDG.

7.    As of December of 1997, the individual defendants

-7-

served in the following capacities at SDG:  Blair Geho, Chairman of the Board and Chief Executive Officer; Robert Geho, President and Director; Hans Geho, General Counsel and Director; Malcom Jozoff, Director; Neil Flanzraich, Director; Charles Fulgraf, Director; and Charles Brain, Director.[2]

8.    Blair Geho is the founder of SDG and the father of Robert Geho, Hans Geho, and Daniel Geho, who was also employed at SDG at various times.

9.    Neil Flanzraich is now President and Vice Chairman of IVAX BioSciences in Miami, Florida.  During much of the time relevant to this lawsuit, Flanzraich was the Group Executive Vice President of the Life Sciences Group at the law firm of Heller, Ehrman, White and McAuliffe in Palo Alto, California.  Prior to his position with Heller, Ehrman, Flanzraich was an executive at Syntex Pharmaceuticals.

10.    Jeffrey Jones was an associate at Heller, Ehrman and served as outside counsel for SDG.  Jones later became General Counsel to both SDG and AMDG.

11.    Malcom Jozoff became the President, CEO, and Chairman of the Board of SDG at the end of 2000 or the beginning of 2001. Prior to assuming these positions at SDG, he held the identical positions at The Dial Corporation until he retired in 2000.

---

[2] During trial, plaintiffs voluntarily dismissed their claims against defendants Charles Fulgraf and Charles Brain without prejudice.

12.    In 1993, while Jozoff was at Procter & Gamble, the SEC filed a complaint alleging insider trading against Jozoff and Ellen J. Millman ("Millman") (who is now Jozoff's wife), which alleged insider trading in connection with Millman's purchase of stock in Noxell.  Without admitting or denying the SEC's allegations, Jozoff voluntarily agreed to pay a fine.

13.  Bianco was elected a director of SDG at SDG's March 23, 1998 board meeting.

14.  Flanzraich, Brain, Fulgraf, and Jozoff resigned as directors of SDG in 2002.

15.  In December of 1997, and at all relevant times thereafter,  SDG's products and work have been based on liposome technology.  Liposomes are microscopic capsules made of fatty materials that could contain proteins, genes, drugs, or other materials.  Liposomes have significant therapeutic value because the body produces them naturally and they can be loaded with other biological materials, such as drugs, and delivered directly to the cells of specific parts of the human body.  Because liposomes are fatty materials, they withstand dilution in the bloodstream, escape destruction by the body's immune system, and are easily received by targeted cells.  Blair Geho testified that, as an example, insulin could be loaded into liposomes, which are injected into the bloodstream.  The liposomes would be

programmed to travel directly through the bloodstream to liver cells. The liver cells would then absorb the liposome and the insulin contents. In theory, using liposomes to deliver insulin could allow for smaller dosages with less side effects because the insulin would only be delivered to liver cells and would not be disbursed throughout the body by way of the bloodstream on their way to the liver. SDG owns patents on several aspects of the liposome delivery system.

16. Defendants believe that the potential value of SDG's technology is that it allows the delivery of already existing therapies and treatments directly to the afflicted part of the body.

17. According to defendants, the process of bringing technology to the market is complex. Pharmaceutical products must meet rigorous testing, manufacturing, and monitoring standards established by the U.S. Food & Drug Administration ("FDA") and its foreign counterparts. At all times, the studied drug must be manufactured in strict compliance with FDA regulations. From the time of inventive discovery to final approval by the FDA, a developer may spend over $100 million during a five to ten year period.

18. As of late 1997, SDG's management and Board had adopted a corporate strategy to use the liposome technology as a platform technology. SDG would then create separate subsidiary companies

for various applications of the liposome platform.  Specifically, SDG contemplated creating subsidiaries that would develop liposome technology to treat various diseases such as diabetes, hepatitis, and asthma.  As part of that strategy, SDG itself was to retain the patents on the delivery system and would concentrate on research associated with the delivery system.  The subsidiaries would concentrate on developing consumer products related to specific applications of the delivery system.  Cash would flow to SDG through contract payments from the subsidiaries for research SDG would perform and eventually through licensing fees for the use of the patented technology SDG holds.  Thus, SDG's focus would be on research, and the research would be funded by the subsidiaries.

19.  AMDG, Inc. ("AMDG") is a Delaware corporation formed on September 12, 1997 and is a subsidiary of SDG.  AMDG has the exclusive license for certain of SDG's technologies to develop therapies for diabetes.

20.  The following people were officers and directors of AMDG as of November of 1997: Hubert Huckel, M.D., CEO and Chairman of the Board; Blair Geho, Director and Chief Science Advisor; Louis Pavloff, Director and COO; Hans Geho, Director, Secretary, and VP of Legal Affairs; Robert Geho, Director, Treasurer, and VP of Administration; Victor Bauer, Director; Neil Flanzraich, Director; Patrick McEnany, Director; and William

-11-

Purcell, Director.

21.  Huckel was the CEO of AMDG at the time AMDG was founded.  He was the former Chairman of the Board of Hoechst-Roussel Pharmaceuticals, which is part of The Hoechst Group, a large international pharmaceutical company.  SDG's management believed that Huckel had the necessary contacts to take AMDG's technology to the upper managements of each of the prospective buyers.

22.  Ingredient Innovations International Co. ("3i") is a subsidiary corporation of SDG, which uses SDG's patented technology to design and produce ingredients for consumer products.  Charles Brain was, during the events pertinent to this lawsuit, the CEO of 3i.  Blair Geho was Chairman of the Board of Directors, and David Wilson, Robert Geho, and Hans Geho were Directors.

23.  SDG Cancer Corporation is a Delaware corporation formed in June of 1998 for the purpose of developing products for the diagnosis and treatment of cancer.  During the events pertinent to this lawsuit, this SDG subsidiary corporation was not actively conducting business.

24.  SDG also contemplated establishing subsidiary spin-off companies to develop therapeutic products for the treatment of asthma and hepatitis, and also to develop veterinary products.

25.  In June of 1997, William Purcell ("Purcell") and Bianco

-12-

met with Blair Geho, Dr. Huckel, and other members of SDG's management at the New York City offices of Gruntal & Co., L.L.C. ("Gruntal"), which is a New York investment banking company that was considering assisting AMDG in raising capital.

26.  At that time, Gruntal was presenting the AMDG opportunity (i.e., the diabetes technology) to a group of investors, and Bianco was among them.  Purcell also attended this presentation.

27.  Bianco and SDG contemplated the possibility of Bianco's investing in SDG.  There were various communications between SDG, Bianco, and Purcell during the summer of 1997 discussing this possibility, but a transaction between the parties did not materialize during the summer of 1997.

28.  Purcell was an employee of AmBase until March of 2001. Purcell performed due diligence on behalf of AmBase and Financial prior to the execution of the December 1997 agreements.  Purcell served as a Gruntal consultant, an AMDG Director, and as far as the defendants were concerned, he represented the AMDG minority shareholders.

29.  At the time Bianco was contemplating investing in SDG, SDG was planning meetings with potential investors in the Seattle area and in Canada with Harvey Hoyt, M.D., a former executive at a large pharmaceutical company and then a venture capitalist consultant.  Those meetings were not successful in raising

financing for SDG.

30. SDG also continued to negotiate with Gruntal for possible financing for the diabetes company. Those talks resulted in the issuance of a November 18, 1997 Private Placement Memorandum ("PPM") by which Gruntal invested $3.75 million in AMDG. Under the terms of the PPM, AMDG was to use the proceeds of the investment to fund its preclinical studies and human trials for its diabetes therapies and for working capital.

31. When, in December of 1997, SDG could not raise funds through Hoyt's contacts, SDG contacted Bianco to determine his interest in investing in SDG. Bianco indicated that he was interested, and negotiations between SDG and Financial began very quickly after that. These negotiations resulted in the creation of Financial, Financial's investment in SDG, and Financial becoming SDG's exclusive investment banker.

32. Blair Geho, Bob Geho, and Hans Geho were all involved with the negotiations with AmBase as was SDG's counsel, Jeffrey Jones, an associate at the law firm of Heller, Ehrman.

33. During the negotiations, Bianco emphasized his connections to major investment firms and represented that he was capable of raising the amount of capital SDG needed to execute its business plan.

34. Prior to and during the parties' December 1997 negotiations, SDG's management believed that SDG was worth about

$40-50 million.

35.  Bianco insisted on investing in SDG at a $20 million valuation.

36.  SDG agreed to sell stock to Financial at a $20 million valuation because SDG believed that Bianco had the contacts and expertise to be successful in raising significant funds for SDG and its subsidiaries.  SDG ultimately decided that gaining Bianco's involvement at a time when it needed cash to pay debts and fund research was worth selling shares at a lower valuation.

37.  Bianco insisted on being made exclusive investment advisor not only to SDG and its proposed subsidiary corporations, but also to certain members of the Geho family.

38.  At the time the 1997 agreements were negotiated and executed, SDG and its directors intended to honor all of SDG's obligations under the agreements, including the exclusivity provision.

39.  The minutes from SDG's December 1, 1997 board meeting reflect SDG's debt, as reported by Robert Geho, as $840,000.

40.  In early December of 1997, Robert Geho initially told Bianco that SDG's debt was about $400,000.  At that time, Blair Geho also told Bianco that SDG's debt was less than the $840,000 reported by Robert Geho at the December 1, 1997 board meeting. Neither Robert nor Blair Geho conveyed this inaccurate information with the intent to deceive Bianco or Financial, but

instead because they had expressed their understanding of the relevant priority of SDG's debts.

41.  Before and during the negotiations, Bianco knew that defendants, and others, estimated SDG's value to be $40 million or more.

42.  Bianco was provided with complete and accurate information regarding SDG's financial condition prior to the closing of the deal, including current financial statements and disclosures prepared by outside accountants, the company's most recent business plan, and the AMDG PPM.

43.  SDG's complete financial picture, including its debts, the amount of shares and stock options that were held by certain directors, and the amount of loans made to SDG by certain directors, was disclosed to plaintiffs in the Stock Purchase Agreement, AMDG's PPM, and SDG's most recent business plan, and Bianco was aware of this information before finalizing the deal. Bianco knew the actual amount of SDG's debt prior to December 30, 1997.

44.  During the negotiations, the parties thereto discussed SDG's retention of Linda Allison, Ph.D., of Snowdon & Associates to produce a report estimating SDG's value.

45.  Bianco did not know that Jozoff had been charged with insider trading while he was an executive at Proctor and Gamble. Jozoff told Blair Geho and Neil Flanzraich about his insider

-16-

trading charges at some unknown point in time.

46.  As part of the transaction, AmBase formed a wholly owned subsidiary, Financial, to perform the investment banking activities for SDG and its subsidiaries.

47.  The deal closed on December 30, 1997, and was comprised of three written agreements.

48.  First, under the terms of the Stock Purchase Agreement, executed by Financial and SDG, Financial purchased approximately a 6.3% equity interest in SDG for $1,250,000.  As part of the Stock Purchase Agreement, Bianco became a director of SDG.

49.  Second, SDG and Financial entered into an Investment Banking Agreement ("IBA" or "Letter Agreement"), which, to paraphrase, provided that Financial would act as the exclusive financial advisor and investment banker for SDG, its affiliates or subsidiaries created after December 30, 1997, and the Geho family as long as they held greater than 5% of SDG's stock, for any and all investments in SDG and its subsidiaries created after execution of the IBA.

50.  The IBA sets forth the following arrangement regarding proposed investments:

> [If SDG] is desirous of engaging in a Transaction[3],
> then [SDG] shall give notice to Financial of such
> proposed Transaction ("Transaction Notice").   The

---

[3] The term "Transaction" is broadly defined to include almost any new venture, investment in SDG, or sale of SDG's assets. (See Ex. 9 at 4).

> Transaction Notice shall describe the proposed Investor
> to the extent applicable, the nature, size and terms of
> the proposed Transaction, the proposed closing date and
> all other material terms and conditions of the proposed
> Transaction.  For a period of 30 business days
> following its receipt of such Transaction Notice,
> Financial shall have the irrevocable right of first
> offer to act as the exclusive financial advisor,
> investment banker, agent, co-agent, co-broker,
> underwriter, co-underwriter, principal or otherwise
> with respect to the proposed Transaction.  If Financial
> exercises its option to act in any of the foregoing
> capacities for [SDG], the parties shall promptly
> negotiate the engagement of Financial in good faith
> terms consistent with those prevailing in the
> investment banking industry.

(Ex. 9 at 1).  "Alternatively, Financial may elect within the 30

business day period . . . to enter into the Transaction as

principal for its own account on such terms as the parties may

mutually agree; provided that . . . [the IBA] is not an offer or

commitment by Financial or any affiliated entity to lend, invest,

or provide other capital to [SDG]."  (Id.).

51.  The IBA states the following with respect to other

investment bankers or advisors:

> [SDG] agrees not to engage any other investment banker
> or intermediary regarding any possible Transaction
> without having given Financial the right of first offer
> described [herein].  If [SDG] is approached
> independently by a potential investment banker or
> intermediary regarding a possible Transaction, [SDG]
> will promptly notify Financial and will disclose to
> Financial the substance of all discussions and
> negotiations, as well as the terms and conditions of
> any proposal, offer or agreement advanced by such
> party. [SDG] will consult with and update Financial on
> a regular basis with respect to any and all such
> discussions or negotiations. [SDG] understands that
> Financial will be entitled to a fee with respect to any
> Transaction with any Investor who independently

approaches [SDG] during the term of Financial's
engagement hereunder, provided that the amount of
Financial's fee in such event shall be mutually agreed
upon in good faith.

(Ex. 9 at 2).

52.  The IBA provides that, with respect to SDG's existing

subsidiaries, AMDG and 3i, SDG's "obligation will be to use its

best efforts to cause such subsidiaries to abide by the terms of

this [IBA]." (Ex. 9 at 1).

53.  AMDG was not a party to the December 30, 1997 Letter

Agreement.

54.  The IBA reserves to SDG the absolute discretion to

reject any deal brought to it by Financial.

55.  Third, Financial and Blair Geho executed a Consulting

Agreement.  Under the Consulting Agreement, Financial paid Blair

Geho a one-time up front fee of $150,000 in consideration for the

following work that he would perform exclusively for Financial:

(i) "promptly advise Financial on a first priority basis, with

respect to all investment or financing opportunities" that came

to his attention; (ii) provide "scientific and technical analysis

of investment and financing opportunities brought to Financial;"

(iii) provide advice with respect to Transactions; and (iv)

introduce Financial to investors.  (Ex. 10). The parties

understood that Blair Geho was to use his contacts to try and

present opportunities for Financial to invest in other companies

and to assist Financial in developing potential investors in SDG.

56.  The $1.25 million and $150,000 payments to SDG from Financial under the Stock Purchase Agreement and the Consulting Agreement originated from AmBase.

57.  One purpose of the investment was to give SDG a clean balance sheet by providing capital to pay SDG's existing debts. SDG used $860,573 of the proceeds from the transaction with Financial to pay off existing debt.

58.  Bianco knew that SDG's board members disagreed with his view that SDG was worth $20 million.  Nevertheless, Bianco believed that SDG's management's would lower their expectations about SDG's value after Financial's investment at a $20 million valuation.  This belief was unreasonable because there were ample reasons for SDG to give Financial a discount from what its management believed to be SDG's full value.  Also, Financial had incentive to buy in at a discount.  Further, SDG had commissioned a third party, Allison, to draft a valuation report to be used to market SDG after Financial invested.  Finally, and most importantly, Financial's performance of its obligations under the IBA was not conditioned upon marketing SDG at a $20 million ceiling.

59.  Further investment in SDG at a $20 million valuation would have diluted SDG's current shareholders' percentage of holdings twice as much as further investment in SDG at a $40 million valuation.  By way of illustration, an investor

purchasing $10 million worth of shares in a company worth $20 million would purchase half the company, whereas the same investment of $10 million in a company worth $40 million would purchase one quarter of the company.  In the latter instance those who owned the entire company would still retain three quarters of the company after the investment, but in the case of the former they would retain half of the company.

60.  At a March 1998 SDG board meeting, Bianco suggested, with the endorsement of the board, that Financial would obtain financing for SDG's proposed subsidiaries.

61.  On January 1, 1998, SDG, through Robert Geho, retained Linda Allison, Ph.D., of Snowdon & Associates to perform a valuation report on SDG and its subsidiaries, both current and prospective, commensurate with industry-accepted valuation methods.  SDG agreed to pay Allison a fixed fee of $15,000 for her services.  This fee was not contingent upon Allison concluding that SDG was worth more than a certain value.  The report was for SDG, which would then use the report as a basis to raise capital.

62.  Allison issued her report in June of 1998 and concluded that SDG was worth $44-48 million.  In her report, Allison based her conclusions upon analysis of comparable start-up medical companies, comparable technologies in comparable phases of development, and the state of the investment market.  Allison

assigned value to SDG, 3i, AMDG, and three other potential SDG subsidiaries in reaching her conclusions.

63.  Financial had access to Allison during her valuation work by way of Purcell, who spoke with Allison regarding her report.

64.   Financial waived its exclusive right to advise SDG in order to permit Allison to market SDG's shares in Europe and Canada.  SDG then engaged Allison for this purpose.  Allison contacted more than twenty-five companies, thirteen of which expressed interest in SDG.

65.  In early 1998, SDG became aware of a new method of creating fully human monoclonal antibodies through Blair Geho's relationship with Robert Canfield, a research scientist at Columbia University.  Monoclonal antibodies are antibodies produced by cloning a class of white blood cells called lymphocytes.  Antibodies are produced by the body to bind to foreign proteins, such as bacteria, viruses, and tumors, and destroy the foreign materials.  Prior to this discovery, monoclonal antibodies for use in humans were produced by cloning rodent cells, which created a host of problems associated with the human body receiving these antibodies.  In theory, an antibody cloned from human white blood cells would be more receptive to the human body than the rodent cells.

66.  Blair Geho and Bianco met with Jack Granowitz of

-22-

Columbia University regarding a license for the human monoclonal antibodies.  The parties discussed SDG's ability to finance its obligations to Columbia at this meeting.

67.  SDG entered into two agreements with Columbia University ("Columbia license agreement"), dated June 25, 1998, which required SDG to pay Columbia a minimum fee of $500,000-$250,000 within sixty days of executing the agreement and another $250,000 on June 25, 1999- together with royalties.  SDG also executed a Research Agreement that obligated SDG to pay $800,000 annually for a three-year term (for a total of $2.4 million) to support the research program of Drs. Ilya Trakht and Robert Canfield.  Under these agreements, SDG undertook to pay Columbia not less than $1.05 million in 1998, $1.05 million in 1999, and $800,000 in 2000.

68.  Allison believed that SDG had significantly increased its financial obligations when it executed the Columbia license agreement because SDG then had two fledgling platform technologies, the liposome and the human monoclonal antibodies, which needed formidable research and development funding prior to becoming commercially valuable products.

69.  Jozoff had reservations about SDG's entering into the Columbia license agreement.

70.  Bianco expressed optimism that Financial could meet SDG's financing needs to fund the Columbia license agreement, but

-23-

Bianco did not guarantee that Financial would do so.

71.  In August of 1998, SDG was concerned about Financial's performance as its exclusive financial advisor.

72.  SDG and Financial entered into a new written investment banking agreement on August 6, 1998.  The August 6, 1998 agreement required Financial to market SDG shares at a valuation of $50 million and stated a target of raising $5 million in capital.  The agreement provided for an 8% fee of the amount raised and other consideration to Financial.

73.  Bianco understood that the IBA and the August 6, 1998 agreement obligated him to work on SDG's behalf to raise financing immediately after the IBA was executed on December 30, 1997.

74.  In September of 1998, Allison reported that her efforts to raise financing in Europe had not been successful, and she expressed her belief that deteriorating market conditions and the lack of clinical results from SDG would be an impediment to raising capital at the valuation she indicated in her report.

75.  By September of 1998, AMDG had taken the first steps toward providing clinical results gauging the performance of its initial product, HDV-I,[4] and had begun a human clinical study at Vanderbilt University.

---

[4] Hepatic Directed Vesicle ("HDV") technology is a liposome that is capable of encapsulating insulin for delivery to the liver's metabolic cells in order to treat Type 1 diabetes.

-24-

76.  By letter dated September 22, 1998, Robert Geho, on behalf of SDG, terminated the August 6, 1998 agreement.  By the same letter, Robert Geho requested that Financial waive its rights under the IBA for a period of three months thereafter. Financial did not waive its rights under the IBA.

77.  Toward the end of 1998, as the AMDG clinical trials were coming to an end, Huckel and Pat McEnany ("McEnany") (whom Huckel had brought on board at AMDG) decided that, rather than representing AMDG in soliciting funding from pharmaceutical companies themselves, as originally contemplated, they needed to hire an investment bank to market AMDG's new product to pharmaceutical companies.  Further, they decided that, as the AMDG management team, they were going to hire Vector Securities as AMDG's banker.

78.  Huckel did not seek AMDG board approval to hire an investment bank, and did not present competing banking offers to the board.

79.  Purcell maintained that the board should decide if an investment banker was to be hired, or at the very least, the board had the right to select the banker.

80.  At a December 1998 AMDG board meeting, the AMDG board fired Huckel and McEnany because of their intransigence related to the investment banking issues.

81.  Once Huckel, McEnany, and the other AMDG directors

close to Huckel were gone, AMDG's board consisted of Flanzraich, Purcell, Blair Geho, Hans Geho, and Bob Geho (with Mal Jozoff joining shortly thereafter). Robert Geho took over as AMDG's CEO.

82.  AMDG completed its clinical trial of the diabetes technology during the late fall and early winter of 1998-1999. The results of the clinical trial were not published until 2001.

83.  The next step in AMDG's business plan was to attempt to license the technology to a major pharmaceutical company.  This company would then pay the substantial cost of the next step of clinical trials.  AMDG's board decided to solicit bids from several leading advisory groups who would present the technology to major pharmaceutical companies.

84.  Purcell requested that AMDG solicit bids from Mehta Partners, OrbiMed Advisors, LLC, Financial, QED Technologies, and Vector Securities, among others.

85.  SDG encouraged Financial to submit a written representation proposal to AMDG's board.

86.  On May 11, 1999, AMDG hired OrbiMed Advisors, LLC ("OrbiMed") as AMDG's exclusive investment banker and paid OrbiMed a retainer of $85,000.

87.  Ultimately, AMDG's board decided to retain OrbiMed rather than Financial or any of the other investment bankers that submitted proposals.  ADMG believed that OrbiMed appeared to be more experienced, competent, and motivated with respect to the

type of work needed by AMDG.

88.  AMDG rejected Financial's proposal to co-manage AMDG's investment banking with OrbiMed.  AMDG did not attempt to negotiate terms of Financial's participation in OrbiMed's activities.

89.  Blair Geho, Neil Flanzraich, Malcom Jozoff, Robert Geho, and Hans Geho believed that Financial was incapable of representing AMDG because Financial had failed to raise any capital for SDG, and, in particular, Financial had failed to raise capital to support the Columbia license agreement. Further, they believed that Financial lacked the motivation and wherewithal to competently present the intricacies of AMDG's technology to sophisticated pharmaceutical company executives. As a result, these AMDG directors were concerned that hiring Financial might constitute a breach of their fiduciary duties.

90.  Financial believed that SDG could cause AMDG to retain Financial as AMDG's exclusive investment banker.

91.  Jim Gale of Gruntal, who represented AMDG's largest group of shareholders, made it known that he did not believe that Financial was capable of representing AMDG.

92.  OrbiMed compiled a list of approximately seventy-five pharmaceutical companies for AMDG to contact.

93.  As AMDG then received interest from certain companies, it entered into confidentiality agreements, gave in-person

presentations, made its Scientific Advisory Board member available for diligence discussions, and permitted companies to conduct patent due diligence.

94.   AMDG had significant interest from Amgen, Aventis and Insmed Pharmaceuticals.  These companies conducted their own internal testing of AMDG's product, HDV-I.

95.   On March 5, 1999, SDG retained Allison to raise capital in Europe.  In June and July of 1999, Allison assisted in arranging a meeting with two potential European investors, who suggested that the Frankel Group value SDG's technologies.  One investor offered to personally extend a "bridge loan" to SDG so that SDG could finance the due diligence.  A transaction never took place between SDG and these entities because SDG was not willing to incur the expense of a second valuation.

96.   By letter dated October 15, 1999 Columbia University placed SDG in breach of the Columbia license agreement with $1,370,617 owed to Columbia.  By letter dated January 20, 2000 Columbia terminated the Columbia license agreement with $1,570,617 owed to Columbia.

97.   On October 20, 1999, Allison sent a memorandum to SDG's board relating her efforts to raise financing in Europe.  Allison summarized the contacts she had arranged and indicated her disappointment in the manner in which Robert Geho handled negotiations with the firms with which Allison had arranged

contacts.

98.  In January of 1999, Bianco, as trustee of a fund for the benefit of his minor children, invested $250,000 in AMDG.

99.  By early 2000, OrbiMed had reported to AMDG that it was not finding any financing or licensing opportunities for AMDG. OrbiMed had presented AMDG to many investors and some of the biggest pharmaceutical companies in the world for licensing ventures.  None were interested enough to sign a deal with AMDG.

100. The consensus regarding AMDG's inability to raise capital was that potential investors wanted AMDG to conduct the next stage of clinical trials, at its own expense, to demonstrate the utility of the technology.  AMDG was never able to fund the second stage itself, nor was it able to secure funding from any other source.

101. Between the time Financial invested in SDG and the spring of 2000, the relationship between Financial and SDG soured.

102. Financial and SDG disagreed over the proper valuation for SDG.  Financial did not believe that SDG could be successfully marketed and sold to investors at a valuation of $40-45 million or more, and Bianco and Purcell communicated this to SDG and all of the individual defendants several times from 1997 on.

103. Bianco, in particular, believed that any attempt to

sell SDG shares at a $40 million valuation shortly after his investment would have been futile. Because Financial was the only significant investor to purchase SDG shares, Bianco thought other investors would demand to know why they must pay twice as much to invest in SDG as Bianco did. According to Bianco, other investors would not accept terms different than those offered to Bianco without a tangible difference in SDG's development of its technology. Bianco believed that he had set the market price for SDG shares and that he could not credibly attempt to sell the shares at twice the price he paid for his shares.

104. Because he believed that tangible results were required from SDG, Bianco limited his solicitation of investors to "soft calls," which he described as preliminary contacts with potential investors to introduce SDG's technology and gauge further interest. Bianco placed twenty to twenty-five soft calls and also kept the potential investors apprized of any developments with respect to SDG's technology. Bianco forwarded written materials to five of these twenty-five contacts who had expressed an interest in an investment.

105. Subsequent to completing her valuation report dated May of 1998, Allison also believed that SDG's management should lower its estimate of SDG's value to better reflect market conditions. In her opinion, the investment market as a whole was less active after May of 1998 than it was before May of 1998.

Because the state of the market was one variable Allison considered when estimating SDG's value, she believed that the estimate should be reduced when market conditions were less favorable.

106. Bianco disagreed with Allison's valuation, and Financial and SDG were not able to construct terms of a proposed transaction once they received Allison's report in May of 1998.

107. While Bianco and SDG's management disagreed about the value of SDG, the pressure to raise capital was increasing. SDG management expected Financial to produce some fundraising results from March of 1998 through June of 1998, but it had not.

108. SDG's acquisition of the human monoclonal antibodies license during June of 1998 exacerbated SDG's already pressing need for capital.

109. SDG's board members, exclusive of Bianco, were disappointed with Financial's inability to raise funds to support the human monoclonal antibodies license. In an effort to raise capital to fund SDG's deal with Columbia, Financial made less than five phone calls and talked to an indeterminate number of persons about monoclonal antibodies.

110. Financial did not improve its efforts to raise funding for SDG after the August 6, 1998 agreement was executed because Bianco was frustrated with SDG's management.

111. Following the August 6, 1998 agreement, Financial did

-31-

not present SDG with a work plan, give SDG any feedback on Financial's efforts, or describe any of its future intentions in raising money for SDG despite being obligated to do so.

112. On September 22, 1998, SDG terminated the August 6, 1998 agreement with Financial.

113. Later in 1999, after AMDG retained OrbiMed as its investment banker, the relationship between SDG and Financial was irretrievably damaged to the point that Financial was preparing to sue SDG.

114. In a letter dated July 28, 1999, Blair Geho asked Bianco to resign from SDG's board and asked Financial to waive its contractual rights with respect to SDG because, in Blair Geho's view, Bianco and Financial had "done nothing to benefit SDG. . . ." (Ex. 173).

115. Shortly thereafter, in October of 1999, Allison reported her disappointment with SDG's management to the SDG board. Allison also spoke to Bianco regarding her concerns with SDG's management, and Bianco echoed these concerns.

116. By the spring of 2000, AMDG had been unsuccessful in its effort to license its product, HDV-I, and SDG had been unsuccessful in raising funds through Snowdon and Financial.

117. As a result, SDG's management concluded that SDG's relationship with Financial should end.

118. Financial did not meet SDG's legitimate expectations

-32-

regarding its obligation to act as SDG's exclusive investment
banker and financial advisor.  Financial's employees, on an
informal basis, spoke to an indeterminate number of potential
investors.  Financial never brought an offer from an investor to
SDG at any valuation.  Throughout the tenure of Financial's
exclusive appointment, Robert Geho met with one person referred
by Financial regarding an investment in SDG.  The record
demonstrates that Financial never memorialized its efforts nor
generated any formal plans or strategies from which the SDG board
could evaluate Financial's efforts.  Financial did not produce
results with respect to the August 6, 1998 agreement.  Most
importantly, SDG's board members, exclusive of Bianco, did not
feel that Financial had worked to create the kind of relationship
with SDG that these board members expected when SDG engaged
Financial.

119. Bianco did not make an effort to learn about SDG's
technology so that he could approach sophisticated biotechnical
investors, despite the opportunity to do so through Blair Geho's
agreement to be Bianco's consultant.

120. A substantial reason why the relationship between SDG
and Financial never produced results was because Bianco and the
members of SDG's board harbored fundamental differences of
opinion.  First, Bianco believed that SDG was worth no more than
$20 million, whereas SDG's board members believed that SDG was

worth about twice that amount.  Second, SDG's board members, especially the Gehos, did not wish to relinquish control over SDG's technology by accepting an investment that would transfer a majority of SDG's shares.  The parties were never able to reconcile these differences, and these differences poisoned the relationship between the parties.[5]

121. Robert Geho expected Financial to "work in a very close way with the management of a company to set up the company, to acquire management teams, to set capital structure, to manage the investment process."  (5/2/03 Tr. 26:19-23).  This type of relationship never developed.

122. At the April 11, 2000 SDG board meeting, the SDG board terminated the IBA with Financial because of Financial's material breach thereof.  As of April 11, 2000, SDG hired Capital South Partners, LLC ("Capital South") as SDG's exclusive investment banker for a six-month period.

123. Capital South and SDG presented SDG's technology to approximately thirty or forty leading venture capital firms in the United States.

124. Blair Geho terminated his Consulting Agreement with Financial on June 12, 2000.

125. From December 30, 1997 through June 12, 2000, Blair

---

[5] The court does not endorse either party's views, but rather simply notes that there was a disagreement.

Geho regularly scanned scientific and medical literature and spoke with various consultants to identify potential investment opportunities for Financial.

126. Blair Geho provided any and all scientific assistance Financial requested.

127. Blair Geho also informed Financial about potential investment opportunities with Cleveland based biotech startups, such as Athersys.

128. Blair Geho introduced Bianco to Phillip Frost, of IVAX Corp., who is one of the world's wealthiest biotech investors.

129. Two weeks after signing the Consulting Agreement, Blair Geho arranged a meeting with the lead scientists in connection with the Columbia technology and representatives of Financial.

130. While the Consulting Agreement was in place, Financial never asked Blair Geho for his advice about a specific project.

131. Financial never asked Blair Geho for a report of his efforts relating to the Consulting Agreement.

132. Blair Geho had no open projects under his Consulting Agreement as of June 12, 2000.

### III. CONCLUSIONS OF LAW

#### A. FIRST-PARTY CLAIMS

AmBase and Financial bring the following claims: breach of contract against defendant SDG (First Claim), breach of the covenant of good faith and fair dealing against defendant SDG

-35-

(Second Claim for Relief), breach of contract against defendant Blair Geho (Third Claim for Relief), breach of the covenant of good faith and fair dealing against defendant Blair Geho (Fourth Claim for Relief), fraud against all defendants, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a-42-110q, against all defendants.  The court holds the following with respect to each claim.

### 1. BREACH OF THE IBA BY SDG

AmBase and Financial claim that SDG breached the IBA in two ways.  First, plaintiffs allege that SDG breached the IBA by failing to use its "best efforts" to cause AMDG to hire Financial as its exclusive investment banker in May of 1999.  Second, plaintiffs contend that SDG also breached the IBA by retaining Capital South Partners as its investment banker in April of 2000 in violation of its obligation to present any financing opportunity to Financial for acceptance in the first right.

The IBA is governed by Connecticut law.  The <u>prima</u> <u>facie</u> elements of a breach of contract action are the existence of an agreement, breach of the agreement by the defendant, and damages to the plaintiff from the breach.  <u>See</u> <u>Courtien Comm., Ltd. v. Aetna Life Ins. Co.</u>, 193 F. Supp. 2d 563, 566 (E.D.N.Y. 2002) (applying Connecticut law); <u>Chem-Tek, Inc. v. Gen. Motors Corp.</u>, 816 F. Supp. 123, 131 (D. Conn. 1993); <u>see also</u> <u>Fairfield Fin. Mortg. Group, Inc. v. Salazar</u>, No. CV000339752S, 2002 Conn.

Super. LEXIS 1352, at *3 (Conn. Super. Ct. Apr. 23, 2002).

   a. Failure to Use "Best Efforts" to Cause AMDG to Retain
        Financial as its Exclusive Investment Banker

   SDG did not breach the "best efforts" obligation in the IBA
when AMDG hired OrbiMed on May 11, 1999.  SDG agreed to use its
"best efforts" to cause its then existing subsidiaries, AMDG and
3i, to retain Financial as its investment banker under the same
terms as the IBA.  SDG was the majority owner of AMDG, and AMDG's
board, with the exception of Purcell, was comprised entirely of
SDG directors.

   The IBA does not define what is meant by "best efforts."  A
best efforts clause requires a party to "active[ly]" and "in good
faith" pursue the goal outlined in the contract, Aeronautical
Indus. Dist. Lodge 91 of the Int'l Assoc. of Machinists and
Aerospace Workers, AFL-CIO v. United. Tech. Corp., 230 F.3d 569,
578 (2d Cir. 2000), and "imposes an obligation to act with good
faith in light of one's own capabilities," Bloor v. Falstaff
Brewing Corp., 601 F.2d 609, 613 (2d Cir. 1979) (citing New York
law).  Although a defendant may "give reasonable consideration to
its own interests" and is not required to "spend itself into
bankruptcy," it cannot "emphasiz[e] profit . . . without fair
consideration of the effect on" the plaintiff.  Id. at 614.  At
the very least, a party must "explore whether steps not involving
substantial losses could have been taken to avoid or at least
lessen the [negative effect on the other party]."  Id. at 613-14.

-37-

Even though SDG could have caused AMDG to hire Financial, SDG's decision not to do so was consistent with its contractual obligation to Financial.  Financial had not raised any capital for SDG, despite SDG's dire need for capital.  Financial and SDG continued to disagree about fundamental considerations underlying efforts to raise capital, such as the value of SDG, what level of dilution of the Gehos' stock ownership would be acceptable, and whether Robert Geho should be President of SDG.  Financial had not produced any tangible results from its efforts to raise capital, nor had it demonstrated the will to learn the nuances of SDG's technology, which would be even more critical to market AMDG's product to major pharmaceutical companies.  Given the deterioration of the relationship between SDG and Financial in 1999, due in no small part to Financial's inability to produce any tangible results in raising capital for SDG, SDG satisfied its contractual obligation to Financial by encouraging Financial to bid for the AMDG contract, keeping Financial informed about the status of the other bids, and giving Financial a chance to prove it could raise capital for SDG.

The record also demonstrates that SDG gave due consideration to alternatives less damaging to Financial.  Financial argues that SDG should have negotiated an arrangement where Financial would share the responsibilities with OrbiMed and would receive a percentage of the fees and commissions paid.  SDG did not

negotiate with Financial.  SDG's decision not to negotiate
Financial's involvement was reasonable under the circumstances
because the true problem with causing Financial to be retained
was that the relationship between SDG and Financial was
dysfunctional.  SDG was contractually bound to use Financial as
its investment banker.  By the spring of 1999, Financial had
produced no results, nor had it indicated that its performance
was likely to improve.  Although SDG was bound by contract to an
unproductive arrangement, AMDG was not yet so bound.  SDG quite
reasonably decided that it would not impose an unproductive and
unworkable arrangement upon AMDG, and this decision is consistent
with its obligation to use its best efforts to cause AMDG to
retain Financial as its exclusive investment advisor.  The
relationship between SDG and Financial was dysfunctional in May
of 1999; therefore SDG reasonably concluded that Financial's
involvement, in any capacity, in AMDG's investment decisions
would be a detriment to AMDG.

     Moreover, because AMDG was an SDG subsidiary, forcing AMDG
to retain Financial may have unreasonably compromised SDG's own
interests.  AMDG had shareholders of its own.  Under Connecticut
law, directors must discharge their duties (1) in good faith; (2)
with the care that an ordinarily prudent person in a like
position would exercise under similar circumstances; and (3) in a
manner reasonably believed to be in the best interests of the

corporation.  <u>See</u> Conn. Gen. Stat. § 33-756(a).  Majority
shareholders also have a fiduciary duty to minority shareholders
to act in the best interests of the corporation.  <u>See</u> <u>Yanow v.</u>
<u>Teal Industries, Inc.</u>, 178 Conn. 262, 281 n.9 (1979).
Financial's performance in the bidding process and as SDG's
exclusive financial advisor was of such poor quality that
selecting Financial to perform services for AMDG may have
compromised the ability of SDG, as majority shareholder, and
AMDG's directors to discharge their duties to AMDG's
shareholders.

Under the circumstances, SDG did not breach the IBA when
AMDG retained OrbiMed as its investment banker.  Causing AMDG to
retain Financial would have been detrimental to AMDG's business
and may have exposed defendants to liability to AMDG's
shareholders for breach of a fiduciary duty.  Judgment shall
enter in favor of SDG on this claim.

b. Termination of the IBA

SDG agreed to give Financial the right of first refusal to
act as SDG's investment manager for any "Transaction" as that
term is defined in the IBA.  With regard to any contemplated
Transaction, SDG was required to present a "Transaction Notice"
to Financial that detailed the terms of the proposed Transaction
including the fee arrangement.  Financial then had a thirty-day
"right of first offer to act as the exclusive financial advisor,

investment banker, agent, co-agent, co-broker, underwriter, co-underwriter, principal or otherwise with respect to the Transaction." (Ex. 9). SDG did not present a Transaction Notice to Financial when SDG retained Capital South Partners as its investment banker on April 11, 2000, and instead SDG terminated the IBA on that same date.

SDG argues that its obligation to perform under the IBA was excused because Financial materially breached the IBA. The court finds the following statement of the law governing this claim persuasive:

> "Contract law has always distinguished between material and immaterial breaches. If a breach is immaterial, the existing rights of the parties do not change. The contract remains enforceable although the breach may occasion liability for damages, if any can be proved . . . a material breach, on the other hand, does affect the substantive rights of the parties. A substantive or material breach is one which touches the fundamental purpose of the contract and defeats the object of the parties in making the contract . . . The standard of materiality [of contractual breach] must be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performance . . . A material as opposed to incidental breach of contract is one that is so important that it vitiates or destroys the entire purpose for entering into the contract."

Liu v. C. Pierce Enterprises, LLC, No. CV0210898, 2004 WL 113568, at *7 (Conn. Super. Ct. Jan. 5, 2004) (alterations and omissions in original) (quoting Fishman v. Smartserv Online, Inc., No. X05CV0172810S, 2003 WL 536629, at *9 (Conn. Super. Ct. Feb. 11, 2003); see Bernstein v. Nemeyer, 213 Conn. 665, 672-73 (1990)

("It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged.").

In order to determine whether a breach is material, Connecticut courts rely upon Section 241 of the Restatement (Second) of Contracts, which provides the following:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Rest. (Second) of Contracts § 241 (1981). Section 241 sets forth certain circumstances that the court should consider significant, and takes into account the harm to both parties to the contract if the contract is terminated.

Financial's failure to perform its obligations under the IBA was material, and SDG was permitted to terminate the IBA. As stated previously herein, Financial had not raised any capital

for SDG, despite SDG's dire need for capital.  Financial and SDG
continued to disagree about fundamental considerations underlying
efforts to raise capital, such as the value of SDG, what level of
dilution of the Gehos' stock ownership would be acceptable, and
whether Robert Geho should be President of SDG.  Financial had
not produced any tangible results from its efforts to raise
capital, nor had it demonstrated the will to learn the nuances of
SDG's technology.  As a result, the court has found that
Financial did not meet SDG's legitimate expectations for its
performance under the IBA, (see, infra, § III., ¶¶ 122-23),
thereby depriving SDG of a benefit it reasonably expected.  See
Rest. (Contracts) Second § 241(a).

       The record does not support Financial's argument that its
obligation to raise capital is only triggered by SDG's issuance
of a Transaction Notice, and, because SDG issued only one
Transaction Notice for a six-week period from August 6, 1998
through September 22, 1998, Financial did not have to raise
capital at any other time.  The testimony of all parties to the
IBA belies this argument; even Bianco understood that Financial
had to identify potential investors and attempt to negotiate
investments.  Further, the record indicates that Financial did
nothing different during the six-week period when the Transaction
Notice was in effect.  Financial had obligations to SDG
irrespective of whether a Transaction Notice had been issued, and

Financial did not meet its obligations.

The balance of factors listed in Section 241 tips in SDG's favor.  The record supports the conclusion that, by failing to perform at a satisfactory level, Financial did not meet SDG's legitimate expectations.  Also, there was little chance that Financial would cure its failure to perform because the relationship between Financial and SDG had deteriorated from dysfunctional in May of 1999 to adversarial in April of 2000. Further, SDG could not be adequately compensated for Financial's failure to perform because there was really no way to quantify the financial loss to SDG in the form of a lost business opportunity.  Although the court notes that Financial's $1.25 million investment was substantial, and that there is no evidence that Financial failed to perform in bad faith, the failed business transaction between SDG and Financial was preventing SDG from going forward with its business plan.  Therefore, although Financial did make a substantial investment, the cost to SDG of an exclusive arrangement with an unwilling investment banker was greater, and SDG was justified in terminating the IBA on April 11, 2000.

Because SDG was justified in terminating the IBA on April 11, 2000, judgment shall enter in favor of SDG on this claim.

## 2. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST SDG

Plaintiffs claim that, by allowing AMDG to hire Orbimed as

its exclusive investment banker and retaining CSP as its
exclusive investment advisor, SDG breached the covenant of good
faith and fair dealing implied in every Connecticut contract.
See Habetz v. Condon, 224 Conn. 231, 238 (1992).  The covenant of
good faith and fair dealing requires that neither party to a
contract do anything that will injure the right of the other to
receive the benefits of the agreement.  See Habetz, 224 Conn. at
238.  To recover under the covenant of good faith and fair
dealing, a plaintiff must show that: (1) plaintiff and defendant
were "parties to a contract under which the plaintiff reasonably
expected to receive certain benefits;" (2) defendant "engaged in
conduct that injured the plaintiff's right to receive some or all
of those benefits;" and (3) defendant acted in bad faith in
committing the acts that injured the plaintiff's right to receive
the benefits it expected from the contract.  ShareAmerica, Inc.
v. Ernst & Young, No. X02CV930150132S, 1999 WL 545417, at *6
(Conn. Super. Ct. Jul. 2, 1999).  Bad faith "in general implies
both actual or constructive fraud, or a design to mislead or
deceive another, or a neglect or refusal to fulfill some duty or
some contractual obligation, not prompted by an honest mistake as
to one's rights or duties, but by some interested or sinister
motive."  Habetz, 224 Conn. at 236-237; see Buckman v. People
Express, Inc., 205 Conn. 166, 171 (1987).

SDG, and the directors named as defendants, did not breach

the covenant of good faith and fair dealing attendant to the IBA. As discussed in the previous section, SDG did not breach the IBA. Therefore, SDG and the defendant directors did not injure Financial's right to receive a benefit from the IBA.  Further, SDG and the defendant directors did not act in bad faith at any time during the events of this lawsuit.  Therefore, judgment shall enter in favor of SDG and the director defendants on this claim.

### 3. BREACH OF THE CONSULTING AGREEMENT AGAINST BLAIR GEHO

Financial claims that Blair Geho breached the Consulting Agreement.  On December 30, 1997, Financial entered into a Consulting Agreement with Blair Geho.  Under the Consulting Agreement, in exchange for $150,000 from Financial, Blair Geho agreed to advise Financial, on a first priority basis, of all investment opportunities of which he became aware.  Blair Geho was also required to advise Financial with respect to Transactions as that term is used in the IBA and introduce Financial to potential investors.  Blair Geho properly terminated the Consulting Agreement by letter dated June 12, 2000.

The Consulting Agreement with Blair Geho is governed by Delaware law. (See Ex. 10 at 4).  The prima facie elements of a breach of contract action under Delaware law are the existence of a contractual obligation, the breach of that obligation by the defendant, and resulting damages to the plaintiff.  H-M Wexford

LLC v. Encorp, Inc., No. 19849, 2003 WL 21254843, at *7 (Del. Ch. May 27, 2003).

Blair Geho did not breach the Consulting Agreement. Rather, he performed his contractual obligations under the Consulting Agreement by providing scientific and technical consulting services to Financial, upon request. Financial does not allege one instance when Blair Geho did not provide services when requested. He also introduced Bianco to certain investors and brought Bianco to a meeting at Columbia University about human monoclonal technology, which Blair Geho originally thought might present an investment opportunity to Financial. Further, Blair Geho regularly searched through medical resources in an attempt to identify potential investors. Plaintiffs have not proven that Blair Geho breached the Consulting Agreement in any way. Therefore, judgment shall enter in favor of Blair Geho on this claim.

### 4. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST BLAIR GEHO

Plaintiffs argue that Blair Geho breached the Consulting Agreement, and that his breach was part of a scheme to defraud Financial. Pursuant to the standard set forth herein, the court concludes that Blair Geho did not breach the Consulting Agreement and did not act in bad faith at any time alleged in this lawsuit. Therefore, judgment shall enter in favor of Blair Geho on this claim.

5. FRAUD AGAINST ALL DEFENDANTS

Plaintiffs claim that all defendants made misrepresentations of fact and failed to disclose material information in order to induce Financial to purchase $1.25 million worth of SDG stock and to pay Blair Geho a $150,000 fee. Specifically, plaintiffs allege that defendants committed fraud by the following actions or omissions: (1) failure to disclose their present intention to market SDG for future investments at a valuation of $40 million or more; (2) failure to disclose their present intention not to permit Financial to perform under the IBA; (3) failure to disclose that they intended to permit AMDG to select an investment banker, even though they had the ability to, and had agreed to use their best efforts to, cause AMDG to hire Financial as its exclusive investment banker; (4) misrepresentations concerning the amount of SDG's debt at the time of the transaction with Financial; and (5) failure to disclose that Jozoff had been the defendant in an insider trading case brought by the SEC.

The elements of common law fraud are: (1) a false representation made as a statement of fact; (2) the representation was untrue and known to be untrue by the party making it; (3) the representation was made to induce the other party to act on it; and (4) the other party acted on the representation to its injury. Kilduff v. Adams, 219 Conn. 314,

-48-

328 (1991); see Weisman v. Kaspar, 233 Conn. 531, 539 (Conn. 1995). "The party asserting such a cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as 'clear and satisfactory' or 'clear, precise and unequivocal.'" Weisman, 233 Conn. at 540.

Fraud encompasses a misrepresentation made recklessly or without belief in its truth, Clark v. Haggard, 141 Conn. 668, 673 (1954), and fraudulent intent may be shown by circumstantial evidence, see Town Bank & Trust Co. v. Benson, 176 Conn. 304, 308-09 (1978) ("The determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances"); see also Hultman v. Depart. of Soc. Servs., 783 A.2d 1265, 1272 (Conn. Super. Ct. 2000) (stating that fraudulent intent "may be inferred from facts and circumstances"). A defendant's actual benefit from the misrepresentation or omission is not an element of fraud.  See Kilduff, 219 Conn. at 328; see also Goodman v. Waugh, 882 F. Supp. 64, 65 (S.D.N.Y. 1995) ("[T]his Court notes that [defendant] need not have benefited financially in order to be liable [for fraud]"); Polonetsky v. Better Homes Depot, Inc., 97 N.Y.2d 46, 54 (N.Y. 2001).

Fraudulent nondisclosure involves (1) the failure to make a full and fair disclosure of known facts connected with a matter

about which a party has assumed to speak; (2) accompanied by an intent or expectation that the other party will make or will continue in a mistake; (3) in order to induce the other party to act to its detriment.  <u>Gelinas v. Gelinas</u>, 10 Conn. App. 167, 173 (1987).

a. Failure to Disclose SDG's Present Intention to
Market SDG at a Valuation of $40 Million
and
b. Failure to Disclose SDG's Present Intention not to Permit
Financial to Perform Under the IBA

Plaintiffs allege that, in December of 1997, each defendant believed that SDG was worth in excess of $40 million, and, at the time Financial purchased SDG stock, each of the defendants had the present intent to require subsequent investments to be made at a valuation of $40 million or more.  Plaintiffs assert that they reasonably believed that Financial would be permitted to use its business judgment and be able to market the company at a $20 million valuation, and that defendants never disclosed that they would insist on a much higher valuation because they knew that Financial never would have purchased SDG stock if SDG would have set a floor on investment valuations of SDG.

Plaintiffs' claim fails because defendants adequately disclosed their true intentions to Financial.  SDG, and its directors who spoke to Bianco, were frank and open with Bianco about their business plan and their estimations of SDG's value. Their internal projections, which were disclosed to Bianco,

valued SDG at above $40 million.  Bianco also knew that
defendants viewed his investment of $20 million as a significant
concession to Financial.  Therefore, defendants did not fail to
disclose the fact that they believed that SDG's value was $40
million or greater, and that they expected to accept investments
in SDG at that valuation.[6]

Plaintiffs' claim also fails because they have not proven
that defendants acted with the intent to deceive Financial.
First, there is no evidence in the record that defendants took
steps to conceal their beliefs about SDG's value.  The fact that
defendants may have discussed, amongst themselves, a general
reluctance to relinquish control of SDG to an investor does not
prove that they intended to deceive Bianco and Financial.

Second, in the absence of any direct evidence of an intent
to deceive Financial, there is no evidence that defendants had a

---

[6] Defendants' belief about the value of SDG and their
willingness to accept investment at a lower valuation cannot be
characterized as a known fact, which is subject to disclosure.
See Pospisil v. Pospisil, 59 Conn. App. 446, 451 ("The mere
intention to perform an act in the future cannot be considered a
'known fact' because a party's intention to perform may never
materialize into actual performance."), cert. denied, 254 Conn.
940 (2000); but see Paiva v. Vanech Heights Constr., Inc., 159
Conn. 512, 515 (1970) ("[A] promise to do an act in the future,
when coupled with a present intent not to fulfill the promise, is
a false representation.").  The evidence offered does not support
this characterization, but the court will also base its holding
on the grounds discussed herein as well because of the nice
distinction between the legal authority cited by the parties.  In
plain language, there is no reason to split hairs over the
precise nature of defendants' intentions when plaintiffs have not
proven fraud.

motive to mislead Financial.  Financial argues that SDG's
financial need is circumstantial evidence of defendants' intent
to deceive Financial.  In December of 1997, SDG did need capital,
and was actively seeking an investment.  SDG's need for capital
was dire enough to, at least partially, motivate defendants to
accept Financial's investment at a $20 million valuation.  The
evidence offered at trial, however, proves that defendants
accepted Financial's investment on what they believed to be less
favorable terms both so that they could obtain the capital SDG
needed and so they could form a strategic alliance with Financial
and Bianco.  Defendants did in fact want SDG's alliance with
Financial to succeed.  Financial's theory that defendants lured
it into investing at a $20 million valuation while knowing that
they would thwart Financial's efforts to secure investment, and
thereby deprive Financial of the benefit of its bargain, is not
supported by the record.  Rather, the record supports the
conclusion that Bianco and defendants disagreed, in good faith,
about SDG's value from day one of their relationship, and the
parties were never able to overcome this difference of opinion to
cultivate a mutually advantageous business arrangement.

    Plaintiffs' theory of defendants' fraud is counter-intuitive
because it implies that defendants would engage in conduct
ultimately harmful to SDG.  Plaintiffs assert that defendants
lured Financial into investing with the intention of erecting

impediments to Financial's ultimate success as SDG's investment banker.  If plaintiffs' theory is correct, then defendants would have effectively precluded SDG from raising any capital during the life of the IBA because Financial was its exclusive investment banker.  The notion that SDG would deliberately hire an exclusive investment banker with the intention of not accepting any investment from this investment banker defies logic.  Because plaintiffs have not met their burden of proving this fraud claim, judgment shall enter for defendants on this claim.

c. Failure to Disclose that SDG's Board Intended to Permit AMDG to Select an Investment Banker

Plaintiffs argue that defendants had a duty to disclose to Financial that, despite their stated and actual ability to control AMDG, and despite their contractual obligation to use their best efforts to cause AMDG to retain Financial, they had the present intent not to exercise their best efforts to cause AMDG to hire Financial.  Plaintiffs contend that defendants made express representations on the issue of investment banking services for AMDG, and therefore were required to make full and fair disclosure to Financial of material facts, including their plan to disregard the "best efforts" clause of the IBA.

Defendants intended to perform their obligations under the IBA to use their "best efforts" to cause AMDG to retain Financial as AMDG's investment banker, and therefore did not commit fraud

in this respect.  There is no evidence in the record that defendants did not intend to perform under the IBA.  As discussed herein, SDG did satisfy its contractual obligations, and there is no indication that it, or any other defendant, intended otherwise prior to December 30, 1997.  As such, plaintiffs' fraud claim fails in this respect.

### 4. Misrepresentations of SDG's Debt at the Time of the Transaction with Financial

Plaintiffs allege that defendants fraudulently misrepresented the amount of SDG's debt in December of 1997 prior to the closing of Financial's stock purchase.  When defendants contacted Bianco in December of 1997 about making an investment in SDG, Bianco inquired about the amount of the SDG's debt.  Robert Geho and Blair Geho, on two different occasions, told Bianco that SDG's debt was about four hundred thousand dollars ($400,000) less than SDG's actual debt obligation.  Further, shortly before the transaction with Financial was to close, Bianco learned the true amount of SDG's debt and asked Robert Geho why he gave Bianco inaccurate information about SDG's debt.  Robert Geho informed Bianco that he had made a mistake.  Plaintiffs allege that defendants' statements about SDG's debt and Robert Geho's explanation for the inaccurate statements were fraudulent misrepresentations.

Plaintiffs contend that Robert Geho had to have known the exact amount of SDG's debt because, on December 1, 1997, at and

SDG board meeting, Robert Geho had reported that the company had $840,000 in debt.  This was the largest amount of debt that the company ever carried.  Plaintiffs argue that Robert Geho is not credible in suggesting that he somehow forgot this figure or was confused about the information that Bianco was requesting.  Robert Geho did not tell Bianco that he did not know the precise amount of debt, or that he was confused by the question.  Rather, plaintiffs contend, he answered by falsely identifying a materially smaller debt figure that he knew would likely be more acceptable to a potential major investor.

Plaintiffs also contend that Robert Geho's credibility in claiming that he forgot the actual amount of SDG's debt or misunderstood Bianco's question is undermined by Robert Geho's surreptitious conduct.  Plaintiffs contend that Robert Geho's deceptive statements to Bianco regarding SDG's debt are consistent with Geho's act of deceptively, and illegally, tape recording telephone conversations with Bianco.  Likewise, plaintiffs contend, Robert Geho's confidential May 13, 1998 memo (Ex. 124) to Jozoff shows his desire to deceive Bianco.

Plaintiffs have not proven fraud because there is no dispute that Bianco knew the true amount of SDG's debt before the closing.  There is no dispute that Bianco had access to all of SDG's financial information and that he did in fact know the true figure.  Although plaintiffs attempt to shift the focus of their

fraud claim away from the misrepresentation of the amount of SDG's debt, the fact that Bianco knew the true amount of SDG's debt before Financial invested its money necessarily precludes finding defendants liable.

Further, plaintiffs have not proven that Robert Geho, or any other defendant, provided the inaccurate information regarding SDG's debt with the intention of deceiving Financial.  The facts that Robert Geho taped conversations with Bianco without Bianco's permission and that Robert Geho expressed an interest in an initial public offering of SDG stock instead of a private investment procured by Financial do not prove that Robert Geho intended to deceive Bianco about SDG's debt, nor do they impeach the credibility of Robert Geho's explanation for providing Bianco with inaccurate information.  The court credits Robert Geho's explanation that he did not have SDG's accounting statements handy when he spoke to Bianco, and that he arrived at the figure he stated to Bianco from memory and his personal understanding of the priority of SDG's debts.  In other words, Robert Geho made an educated guess about SDG's debt based upon his understanding and not generally accepted accounting principles, and reported to Bianco that SDG had about $400,000 in debts he considered to be of the highest priority.  The fact that he had reported SDG's debt as $840,000 when he had the accounting statements in front of him at SDG's December 1, 1997 board meeting does not

necessarily mean that he remembered this figure or that, within the context of his discussion with Bianco, Robert Geho could not have been mistaken about the nature of Bianco's inquiry.  As such, even if plaintiffs' claim is not necessarily precluded by Bianco's knowledge of SDG's true debt, plaintiffs have not proven that Robert Geho acted with the intent to deceive Financial.

Therefore, judgment shall enter in favor of defendants on this claim because plaintiffs have not proven that Robert Geho, or any other defendant, acted with the intention of deceiving Financial when Robert Geho provided inaccurate information regarding SDG's debt.

5. Failure to Disclose that Jozoff Had Been the Defendant in an Insider Trading Case Brought by the SEC.

Plaintiffs claim that defendants had a duty to disclose Jozoff's 1993 insider trading charge.  They contend that, by making representations to Financial about the experience, expertise, and other qualifications of its directors, SDG assumed a duty to fully disclose all material facts about those directors.  Plaintiffs claim that, had they learned that Jozoff was charged with insider trading, Financial would not have executed a contract with SDG.

Plaintiffs have not met their burden of proving that any defendant had a duty to disclose the information to Financial or that any defendant failed to disclose the information with the intention of deceiving Financial.  Plaintiffs have not proven

-57-

that SDG knew of the SEC charges against Jozoff prior to the
December 30, 1997 closing date. Jozoff told Blair Geho and Neil
Flanzraich about his insider trading charges at some point, but
there is no indication in the record of when Jozoff told them.
Therefore, if no director (except Jozoff) at SDG knew of the
charges prior to the closing, no defendant could have had a duty
to disclose this information to Financial.  Further, Jozoff
himself had no duty to disclose this information to Financial.
Therefore, judgment shall enter in favor of defendants on this
claim.

      6. VIOLATION OF CUTPA AGAINST ALL DEFENDANTS

     Plaintiffs contend that, when SDG and Financial were
negotiating Financial's purchase of SDG stock, defendants
developed and implemented a plan to make a series of
misrepresentations that were intended to induce plaintiffs to
invest in, and save, their company.  Plaintiffs claim that
defendants' five material misrepresentations and omissions
discussed in the preceding section of this memorandum constitute
defendants' plan to say what was required to induce plaintiffs'
investment but then revert to a "business as usual" plan after
the funds were received.  Plaintiffs claim that this plan and
series of misrepresentations satisfies each element of CUTPA.

     Plaintiffs have not proven that defendants violated CUTPA;
their claims fail for two distinct reasons.  First, defendants'

actions were not undertaken in the conduct of SDG's trade or
commerce.  Second, as an alternative ground, defendants' actions
do not amount to an unfair trade practice.

a. Conduct of Trade or Commerce

Defendants argue that their actions were not undertaken in
the course of trade or commerce, and therefore plaintiffs cannot
prevail on their CUTPA claims.[7]  CUTPA provides that "[n]o person
shall engage in unfair methods of competition and unfair or
deceptive acts or practices in the conduct of any trade or
commerce."  Conn. Gen. Stat. § 42-110(b).  "Trade or commerce" is
defined as "the advertising, the sale or rent or lease, the
offering for sale or rent or lease, or the distribution of any
services and any property, tangible or intangible, real, personal
or mixed, and any other article, commodity, or thing of value in
this state." Conn. Gen. Stat. § 42-110a(4).  A person need not be
a consumer to bring a CUTPA claim, see Larsen Chelsey Realty Co.
v. Larsen, 232 Conn. 480, 496 (1995), and the Connecticut Supreme
Court has repeatedly emphasized that it is not the type of
relationship between the two parties but rather the defendant's
actual conduct that is dispositive of whether the actions took
place in the course of a trade or commerce, see, e.g., Fink v.

---

[7] Flanzraich has presented this argument in his Rule 52
motion.  The court has denied his motion because he did not
clearly demonstrate that there was no properly presented issue of
fact framed for decision.

<u>Golenbock</u>, 238 Conn. 183, 213-15 (1996).

Although the general consensus amongst Connecticut courts is that CUTPA does not apply to every single transaction in every single context, there is disagreement over the means of determining CUTPA's scope. Some courts, including a decision adopted by the undersigned, have held that "a CUTPA violation may not arise out of conduct that is merely incidental to the performance of one's trade or commerce." <u>Cornerstone Realty, Inc. v. Dresser Rand Co.</u>, 993 F. Supp. 107, 113 (D. Conn. 1998); <u>see Arawana Mills Co. v. United Technologies Corp.</u>, 795 F. Supp. 1238, 1253 (D. Conn. 1992). Other courts have held that "an isolated transaction that occurs outside the ordinary course of the defendant's primary business may constitute a CUTPA violation provided it takes place in a business context." <u>Duncan v. PEH I</u>, No. CV020817088S, 2003 WL 1962789, at *3 (Conn. Super. Ct. Apr. 1, 2003); <u>see Metcoff v. NCT Group, Inc.</u>, No. X04CV040184701S, 2005 WL 288769, at *4 (Conn. Super. Ct. Jan. 10, 2005); <u>Feen v. Benefit Plan Administrators, Inc.</u>, No. 406726, 2000 WL 1398898, at *5 (Conn. Super. Ct. Sept. 7, 2000); <u>see also Begelfer v. Najarian</u>, 381 Mass. 177, 191 (1980) (construing Massachusetts statute closely resembling CUTPA, and stating that "[w]e do not read § 11 as requiring that a commercial transaction must take place only in the ordinary course of a person's business or occupation before its participants may be subject to liability

under G.L. c. 93A, § 11.").[8]  Defendants urge the court to follow the former line of cases, while plaintiffs urge the court to adopt the "business context" line of cases.

Rigid application of either line of cases is not consistent with the purpose of CUTPA and the language of Section 42-110a(4). Applying the line of cases holding that CUTPA only applies to transactions taking place within the business defendant's primary line of business could limit CUTPA's scope beyond that contemplated by the legislature; this court draws from these cases the proposition that whether the business defendant

---

[8] The court notes that Massachusetts case law from which the "business context" terminology is drawn may not be a perfect analogy to CUTPA. Although CUTPA and Chapter 93A of the Massachusetts General Laws share many nearly identical provisions, Chapter 93A, unlike CUTPA, contains a section that specifically provides for liability for unfair or deceptive acts in connection with a commercial transaction between two businesses. See Mass. Gen. Laws Ch. 93A, § 11 (1997) ("Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court. . . ."); see, e.g., Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 22-23 (1997) ("The applicability of G.L. c. 93A, §§ 2(a) and 11, to interaction between two parties requires a dual inquiry: first, the court assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.'"). The Massachusetts cases rely at least in part upon the existence of this section in interpreting the provisions of Chapter 93A in effect in Connecticut. See Lantner v. Carson, 374 Mass. 606, 610-11 (1978).

ordinarily engages in this type of transaction is one factor to
consider in determining whether the transaction occurred in the
conduct of trade or commerce.  At the other extreme, the
"business context" line of cases holding that "an isolated
transaction that occurs outside the ordinary course of the
defendant's primary business may constitute a CUTPA violation
provided it takes place in a business context," Duncan, 2003 WL
1962789, at *3, could be applied to broaden CUTPA's scope beyond
that contemplated by the legislature.  The fact that a business
is a party to a transaction, and therefore the transaction itself
takes place in a "business context," does not mean that the
business has acted in the conduct of trade or commerce with
respect to that transaction for the purpose of CUTPA liability.

CUTPA does not apply to an action simply because that action
was undertaken by a business or businessperson.  The Connecticut
Supreme Court has recognized limits on extending CUTPA liability
to actions taken by businesses.  For example, a business's
actions in the context of employment fall outside the scope of
CUTPA.  See, e.g., Banerjee v. Roberts, 641 F. Supp. 1093, 1108
(D. Conn. 1986) ("[A]lthough an employer may engage employees for
the purpose of promoting trade or commerce, the actual employment
relationship is not itself trade or commerce for the purposes of
CUTPA.") (internal quotation marks omitted); United Components,
Inc. v. Wdowiak, 239 Conn. 259, 264-65 (1996) (affirming trial

court's conclusion that plaintiff's "claim involved an employer-employee relationship and did not rise to the level of trade or commerce cognizable under CUTPA"); <u>Quimby v. Kimberly Clark Corp.</u>, 28 Conn. App. 660, 670 (1992) (same).  Also, "purely intracorporate conflicts do not constitute CUTPA violations. . . ."  <u>Ostrowski v. Avery</u>, 243 Conn. 355, 379 (1997); <u>see</u> <u>Spector v. Konover</u>, 57 Conn. App. 121, 133 (2000).  Although CUTPA applies to transactions between businesses and transactions between businesses and consumers, CUTPA does not apply to transactions a business undertakes for the purpose of managing its own intra-corporate affairs.

Here, SDG was not acting in the conduct of trade or commerce when it entered into the transactions with Financial on December 30, 1997.  SDG's primary business is to invent, patent and develop targeted drug delivery systems and delivery systems for pharmaceutical and consumer product applications.  Negotiating terms of a private investment and exclusive investment banker agreement is incidental[9] to SDG's primary business.  Because the

_____

[9] Plaintiffs inaccurately equate the use of the phrase "incidental to" in this context to "unimportant to".  Pursuant to this argument, because fundraising was essential to SDG's continued operation, the manner in which it raised funds through investment could not be "incidental" to its core business.  Many activities that have nothing to do with a company's primary business, such as personnel matters, are absolutely vital to its continued operation, yet are considered beyond the scope of CUTPA's reach.  In the context of defining the scope of the term trade or commerce under CUTPA, the term "incidental to" does not mean "unimportant to", but rather "collateral to".

transaction was a private investment and services agreement, there is no nexus to the offering of goods and services on unfair terms to the general public or allowing a business in a market to gain a competitive advantage through unscrupulous conduct. Rather, the transaction at issue more closely resembles the formation of a joint venture or intra-corporate activity. As such, SDG, and the other defendants, did not act in the conduct of trade or commerce and cannot be held liable for violating CUTPA.

### b. Unfair or Deceptive Practices

In the alternative to the holding set forth in the preceding section, the court holds that plaintiffs have not proven that defendants committed an unfair or deceptive trade practice. The Connecticut Supreme Court has adopted the following description of the nature of an unfair or deceptive trade practice:

> "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]."

McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 568 (1984) (quoting Conaway v. Prestia, 191 Conn. 484, 492-93 (1983)) (alterations in original). Further, "'a violation of CUTPA may be established by showing either an actual deceptive practice . .

. or a practice amounting to a violation of public policy. . .
.,'" Cheshire Mortg. Service, Inc. v. Montes, 223 Conn. 80, 106
(1992) (quoting Web Press Services Corporation v. New London
Motors, Inc., 203 Conn. 342, 355 (1987)) (citations omitted), and
"a party need not prove an intent to deceive to prevail under
CUTPA. . . .," id. (citations omitted).  A trade practice
violates CUTPA when the practice "offends public policy or comes
within some established concept of unfairness," when "the
practice is immoral, unethical, oppressive or unscrupulous," or
when "it causes substantial injury to consumers, competitors or
other businessmen." Muniz v. Kravis, 59 Conn. App. 704, 713
(2000).

    Plaintiffs' CUTPA claim shares the same factual predicate
for their fraud claims and fails for chiefly the same reasons
when judged by the preponderance of the evidence standard.  With
respect to plaintiffs' claim that defendants did not disclose
their decision to not accept investment in SDG at less than a $40
million valuation, plaintiffs' claim fails because defendants
adequately disclosed their true intentions to Financial, and
therefore did not deceive Financial or otherwise act unfairly.
SDG, and its directors who spoke to Bianco, were frank and open
with Bianco about their business plan and their estimations of
SDG's value. With respect to plaintiffs' claim that defendants
intended to breach the IBA before executing the IBA, the court

finds that defendants intended to perform their obligations under the IBA to use their "best efforts" to cause AMDG to retain Financial as AMDG's investment banker, and therefore did not deceive plaintiffs or otherwise act unfairly in this respect. With respect to plaintiffs' claim that defendants misrepresented SDG's debt and misrepresented the reason for conveying inaccurate information, the court finds that Robert Geho made an educated guess about SDG's debt based upon his understanding and not generally accepted accounting principles. Because plaintiffs had access to all of SDG's financial data in advance of the December 30, 1997 closing, and because Robert Geho's explanation for his inaccurate report is true, defendants did not deceive plaintiffs or otherwise act unfairly. Finally, plaintiffs have not proven that SDG knew of the SEC charges against Jozoff prior to the December 30, 1997 closing date, and therefore defendants could not have deceived plaintiffs or otherwise acted unfairly. Further, Jozoff did not act unfairly or unscrupulously by not informing plaintiffs of the SEC charges because he had no duty to plaintiffs to disclose this information.  Judgment shall enter in favor of all defendants on plaintiffs' CUTPA claims.

### B. COUNTERCLAIMS

Counterclaim plaintiff SDG brings an action for damages against counterclaim defendant Financial alleging breach of fiduciary duty (Count I), breach of written contract (Count II),

breach of unwritten contract (Count III), negligence (Count IV), and promissory estoppel (Count IV).

### 1. BREACH OF FIDUCIARY DUTY

SDG claims that, as SDG's exclusive investment banker and financial advisor, Financial owed SDG fiduciary duties.  A relationship is fiduciary in nature when it is "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other."  Konover Dev. Corp. v. Zeller, 228 Conn. 206, 219 (1994) (quoting Dunham v. Dunham, 204 Conn. 303, 322 (1987)) (internal quotation marks omitted).  "The law will imply fiduciary responsibilities only where one party to a relationship is unable to fully protect its interests or where one party has a high degree of control over the property or subject matter of another and the unprotected party has placed its trust and confidence in the other."  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 41 (2000) (quoting Ward v. Lange, 553 N.W.2d 246, 250 (S.D. 1996)) (internal quotation marks, brackets omitted).

Financial and SDG did not have a fiduciary relationship.  Their relationship arose from an arm's length transaction between sophisticated business parties.  SDG did not rely solely upon Financial to raise capital; the IBA left open the possibility of proposed investments from other sources, and SDG did retain

Allison and Snowdon to raise capital outside the U.S.  Also, SDG
retained the absolute discretion to accept or reject any proposed
transaction presented by Financial, and thus did not commit
raising capital solely to Financial's expertise and discretion.

Although SDG undoubtedly entered into the transaction with
Financial because its principals felt that SDG would benefit from
Bianco's expertise, "[t]he fact that one business person trusts
another and relies on the person to perform [his or her]
obligations does not rise to the level of a confidential
relationship for purposes of establishing a fiduciary duty."
Hi-Ho Tower, Inc., 255 Conn. at 41-42 (quoting Garrison
Contractors, Inc. v. Liberty Mutual Ins. Co., 927 S.W.2d 296, 301
(Tex. App. 1996)) (internal quotation marks, brackets omitted).
Because SDG's relationship with Financial did not confer "the
authority to exercise over [SDG] the control, dominance or
influence characteristic of fiduciary relationships," Hi-Ho
Tower, Inc., 255 Conn. at 42, Financial was not a fiduciary with
respect to SDG.  Judgment shall enter for Financial on this
claim.

## 2. BREACH OF THE IBA

### a. EXPRESS TERMS

SDG claims, as this court has already found, that Financial
breached the IBA by failing to put forth the effort required to
raise capital for SDG.  SDG, however, has not proven damages with

the required specificity.

The Connecticut Supreme Court has articulated the following standard for determining the amount of an award of damages for the breach of a contract:

> The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . It has traditionally been held that a party may recover "general" contract damages for any loss that "may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself." Hadley v. Baxendale, 9 Ex. 341, 354, 156 Eng. Rep. 145 (1854). . . . This court has consistently applied the general damage formula of Hadley v. Baxendale to the recovery of lost profits for breach of contract, and it is our rule that unless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach. . . .

West Haven Sound Development Corp. v. West Haven, 201 Conn. 305, 319-20 (1986) (internal quotation marks, citations, and alterations omitted). "Damages for breach of contract are to be determined as of the time of the occurrence of the breach." Id. at 317.

SDG's claim for damages is based upon the presumption that, had Financial performed under the terms of the IBA, it would have been able to raise capital for SDG, and SDG would not have been held in breach of the Columbia license agreement. The claimed damages do not flow naturally as a consequence of Financial's breach because investment in SDG is substantially influenced by a

host of factors beyond the control of Financial.  Financial had
an obligation to market SDG and negotiate investment from other
sources in SDG.  Financial did not promise to invest its own
money, and SDG was not obligated to accept any proposed
transaction.  Many factors beyond Financial's control influenced
its ability to procure investment in SDG, such as market
conditions and SDG's willingness to accept terms.  SDG has not
proven that, had Financial performed, other parties would, as
likely or natural consequence, have invested in SDG.   Therefore,
SDG has not proven that it is entitled to the damages it claims.
Judgment shall therefore enter in favor of Financial on this
claim.

b. IMPLIED TERMS

SDG claims that an agreement with Financial arose, by
implication, that Financial would provide funding for SDG's
proposed subsidiaries, including a subsidiary formed to market
the technology licensed from Columbia University.  "A contract
implied in fact, like an express contract, depends on actual
agreement."  Coelho v. Posi-Seal Intern., Inc., 208 Conn. 106,
111 (1988) (internal quotation marks omitted).  This agreement
may be manifested by "by words or action or conduct. . . ." Id.
at 112.  "Although both express contracts and contracts implied
in fact depend on actual agreement; . . . '[i]t is not fatal to a
finding of an implied contract that there were no express

manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations.'" Janusauskas v. Fichman, 264 Conn. 796, 805 (2003) (quoting Rahmati v. Mehri, 188 Conn. 583, 587 (1982)).

SDG has not proven that Financial agreed to provide funding for the technology licensed from Columbia University.  Although Bianco attended a meeting with Columbia officials and SDG principals, and SDG's management consulted with Bianco prior to entering into the Columbia license agreement, Bianco did not expressly guarantee to raise sufficient funds to support the Columbia license agreement, and Bianco's actions do not reflect his intention to do so.  Bianco was present at this meeting to support SDG inasmuch as SDG represented to Columbia that it was serious about raising funds to support the technology and not for Bianco to make assurances about the likelihood that SDG would in fact raise the funds.  The evidence offered at trial proves that Bianco was confident in his ability to raise funds in general, and that he expressed his beliefs, but this vague expression of confidence is insufficient for this court to imply that Financial effectively guaranteed that it would raise sufficient funds to support the Columbia license agreement.  Judgment shall enter in favor of Financial on this claim.

### 3. PROMISSORY ESTOPPEL

SDG's promissory estoppel claim fails for the same reason as

its implied contract claim.  With respect to promissory estoppel, the Connecticut Supreme Court has endorsed the approach set forth in Section 90 of the Restatement (Second) of Contracts, which provides the following:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Rest. (Second) Contracts § 90 (1981).  "A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance."  D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 214 (1987).  As discussed in the immediately preceding section, Bianco did not make a clear and definite promise to raise the capital necessary to support SDG's obligations under the Columbia license agreement. Therefore, this court cannot provide relief under Section 90 of the Restatement, and judgment shall enter for Financial on this claim.

### 4. NEGLIGENCE

SDG claims that Financial was negligent in performing its duty to act as SDG's exclusive investment banker.  To the extent SDG alleges "negligent breach of contract," its claims fail.  See Dean v. Hershowitz, 119 Conn. 398, 409 (1935) ("[A] mere breach of the contract would not afford a basis for recovery in tort. .

-72-

. .").  SDG asserts, however, that Financial breached its duty of care by steering SDG into improvidently executing the Columbia license agreement.  Even if a duty did exist, Financial did not breach this duty.  Financial did not steer SDG into executing the Columbia license agreement; although Financial did not oppose the transaction, and supported SDG in its dealings with Columbia officials, SDG's management wanted to acquire the license, and did so cognizant of the risks involved.  Bianco's general expressions of optimism regarding Financial's ability to raise funds to support the license agreement cannot be construed as steering SDG into the transaction.  Therefore, judgment shall enter in favor of Financial on this claim.

### IV. CONCLUSION

For the foregoing reasons, the court orders the following:

1.    Plaintiffs' motion to strike (dkt. # 87) is **DENIED** for the reasons cited in defendants' memorandum of law in opposition thereto (dkt. # 115).

2.    Defendants' Motion to Strike Testimony of Linda Allison (dkt. # 78) is **DENIED** for the reasons set forth in plaintiffs' memorandum in opposition thereto.

3.    Plaintiffs' Objection to the Admission of Plaintiffs' 30(b)(6) Deposition Transcript (dkt. # 106) is **SUSTAINED in part** and **OVERRULED in part**.

4.    Flanzraich's motion for judgment on partial findings

(dkt. # 102) pursuant to Rule 52(c) of the Federal Rules of Civil Procedure is **DENIED**.

5.    Judgment shall enter for defendants SDG, Inc., W. Blair Geho, Robert Geho, Hans Geho, Neil Flanzraich, and Malcolm Jozoff on each count of plaintiffs AmBase Corporation and SDG Financial Corporation's complaint.

6.    Judgment shall enter for counterclaim defendant SDG Financial Corporation on each count of counterclaim plaintiff SDG Inc.'s complaint.

7.    The Clerk of the Court shall close this file.

So ordered this 3rd day of August, 2005.


                                        **/s/DJS**
                          _____
                              **DOMINIC J. SQUATRITO**
                          **UNITED STATES DISTRICT JUDGE**